# PRACTICE REPORTS.

## COURT OF APPEALS.

### The Farmers' & Mechanics' Bank of Kent County, Maryland agt. The Butchers' & Drovers' Bank.*

The party making and uttering a *certificate of " good,"* written upon the face of a *bank check* or other negotiable paper designed for circulation, stands in the relation of an *acceptor*, with all the responsibilities incident to that relation. The certificate means nothing less than this, but it means something more. It imports that the *drawer has funds*, or means convertible into funds, *in the hands of the drawee at the time*, which shall be retained and devoted to the payment of the paper on presentation.

A general and correct definition of the term *" agency"* implies the power to do just what the principal has authorized, and no more.

If the power to act is conferred by *writing*, then the instrument will define what the power is, and the extent of it; and if by *parol instructions* to do a particular act or series of acts relating to a particular business or subject, then the authority must be ascertained from the express instructions given, and such implied authority as may be necessary to give them effect.

If the agency arises, as it must in many cases, where there is no written authority, and no express parol instructions, from the relation which the agent maintains towards his principal, and the nature of the employment, it is obvious that the extent of the powers to bind the principal must depend upon other elements— such as the character of the relation; the nature of the employment; the custom and usage of the business; and the recognition and acquiescence; which must each of them, enter largely into the consideration of the extent of the agent's authority. And this principle is peculiarly applicable to the class of agencies represented by *the officers of corporate companies.*

---

* Note.—The doctrines of agency have recently been much discussed in our court of appeals, and one of the most instructive cases upon the duties of agents and the liabilities of principals for their acts, is that above entitled. It is reported in 16 *N. Y. R.* 125, where Judge Selden's opinion alone is given; but it appears by that report that Chief Judge Denio and Judge Brown also delivered opinions. That of the Chief Judge will be found in 4 *Kern.* (14 *N. Y.*) *R.* 623; and as it seems desirable that the profession should be made acquainted with the views of the whole court in so leading a case, we here publish the opinion of Judge Brown, which has been obtained from the reporter of the court of appeals, and is authentic.

Farmers' & Mechanics' Bank of Kent Co. agt. Butchers' & Drovers' Bank.

In determining the nature and extent of the authority which this latter class of agents may rightfully exercise, the courts may take judicial notice and recognize the general course of the *banking business* as it is now conducted, and the universal practice of those employed to conduct it. They may know that the circulating notes are signed by the presidents and cashiers; that the deposits are received and paid out by the clerks, tellers and cashiers; and the certificates of deposits, and the certificates upon the face of checks drawn by the dealers and depositors, are signed by the same class of officers, or by one of them.

The *authority* of this class of agents to do these acts within the walls of the banking institutions and at their counters, is *never the subject of inquiry or examination*. It is never doubted or questioned, but is *presumed* from the nature of the employment and the necessities of the business.

The rule that he who deals with the agent of another is bound to look into the agent's *commission* for the measure of his authority, must have a qualified application to an agent with a *general power, coupled with a limitation not patent or open to common observation*.

Therefore, where the *teller* or other proper officer of a banking corporation, representing it and doing its business at the counter, *certifies checks* of its dealers and depositors drawn upon it in the usual form under a *general power to certify*, such banking corporation is responsible to holders in good faith and for value, notwithstanding *private directions not to certify in the absence of funds without special permission*.

APPEAL from a judgment of the superior court of the city of New York. The action was to recover the amount of five checks drawn upon the defendant by one Green, and certified by the defendant's paying teller on their face to be good. The checks were not drawn against funds, and the teller, in fact, had no authority to certify such checks. The jury found that the plaintiffs were *bona fide* holders for value of the checks, and they had judgment for their amount. The defendants appealed to this court.

JOHN H. REYNOLDS, *for the appellants.*
HENRY A. CRAM, *for the respondents.*

BROWN J. The judge charged the jury, upon the trial of this action, that there was no doubt of the authority of Peck, the teller of the defendant, to certify checks in the manner in which the checks in question were certified, so as to bind the defendant to pay them to holders taking them *bona fide* and for value, in the usual course of business. The defendant thereupon excepted. The proposition involves

the main question in the action, and I will return to it presently. He also charged, that if the jury found that the plaintiff had previously held similar checks certified by Peck, the teller, in the same manner as the checks in controversy, which had been paid by the bank on presentation and without objection, and if they also found that the plaintiff took them in good faith for value and without notice of the agreement between Green, the drawer, and Peck, the teller, that they were to be returned to and not paid by the bank, and without notice that Peck in certifying them had exceeded his authority, the plaintiff was entitled to recover. To this also the defendant excepted. The instruction was in effect that the jury might infer Peck's authority from previous transactions and acts of the same kind, which had been accepted and approved by the defendant without objection. In this I see no error, because the agent's authority might have been proved by an express direction, or by the usual and customary course of business at the bank. The residue of the proposition, that they must also be satisfied the plaintiff had no notice of the agreement between Peck and Green, or that the former accepted, in violation of his duty, before they could give the plaintiff a verdict, was certainly unexceptionable and needs no further notice. The jury were also told, and I think correctly, that the plaintiff was a holder for value, if it took the checks in payment and satisfaction of the installments of stock sold to or subscribed for by Green and others, and not as collateral security for the payment of such stock subscriptions. The verdict for the plaintiff must therefore be deemed to establish the facts, that the plaintiff took the checks in good faith, in the usual course of business, for value, and without notice of any want of authority by Peck, or of the agreement between him and Green, that the checks were not to be paid by the defendant. There is no conflict of evidence and no dispute about the facts. We are therefore left to consider whether Peck

had authority under the proof to certify the checks for the bank, and if so what was the duty and obligation which it incurred thereby.

Checks upon banks have most of the qualities of inland bills of exchange. They are drawn for a sum certain upon a person or corporation usually having funds of the drawer sufficient for their payment, and are payable on presentation. If payable to bearer they pass by delivery, and if to the order of the payee by indorsement, in the usual form. They are not payable on time, and are therefore not presented for or subject to acceptance, and in this particular they differ from bills of exchange. The drawer may be made liable as the drawer of a bill of exchange upon presentation within a reasonable time and notice of non-payment. Most of the rules respecting bills of exchange and promissory notes affect checks on bankers. (*Chitty on Bills*, 515; *Harker* agt. *Anderson*, 21 *Wend.* 372). I assume that the practice of having the drawee mark and certify upon the face of the check, that it is good for the sum therein expressed, is of recent origin, for I find nothing said of it by the early writers, and but few reported cases where the practice is referred to. It is, however, at the present day a prevalent custom. Checks drawn upon banks or bankers thus marked and certified enter largely into the commercial and financial transactions of the country. They pass from hand to hand in the payment of debts, the purchase of property, and in the transfer of balances from one house and one bank to another. In the great commercial centers they make up no inconsiderable portion of the circulation, and thus perform a useful, valuable, nay, an almost indispensable office. They are enabled to perform these important functions, mainly upon the faith and credit given to the certificate of the drawee that they are good. It is this that gives them credit and currency with commercial men. The object of the drawer who obtains the certificate, and the purpose of the drawee in giving it, is to impart

strength and credit to the paper, and to assure all who accept it in the course of trade, that it will be paid on presentation. The certificate is an undertaking—a contract—and in determining its legal effect we must ascertain, if we can, the intent of the parties; that is, the party who makes and the party who accepts it. The maker of the certificate puts his name to it with a view to its circulation, and to assure those to whom the paper may be offered, that it will be paid on presentation; and the party who accepts it does so upon the faith and credit of this representation and assurance. The paper upon which the certificate is impressed is negotiable by delivery, or by indorsement, and designed for circulation, and in respect to all the subsequent holders the party making and uttering the certificate stands in the position of an acceptor with all the responsibilties incident to that relation. The certificate means nothing less than this, but it means something more. It imports that the drawer has funds, or means convertible into funds, in the hands of the drawee at the time, which shall be retained and devoted to the payment of the paper on presentation. If it does not mean this, the certificate is a sham and a snare. The learned judge who delivered the opinion in *Massey* agt. *The Eagle Bank* (9 *Metcalf*, 309), says: "Unless the word good carries with it a binding evidence of the fact that the money is in the bank to meet that particular check, and that it will be paid to bearer at any time when presented, it is of no practicability." (*Vide also, Willetts* agt. *The Phœnix Bank*, 2 *Duer*, 121). This view leaves no doubt of the liability of the defendant to respond to the plaintiff for the amount of the checks, provided the certificates are its acts or made by its authority.

This brings me to consider what is doubtless the main question; that is, the authority of Peck, the teller, to make the certificates. He was an officer of the Butchers' and Drovers' Bank, a monied corporation with banking powers, and like all other corporate officers was. its servant and

agent, having power to bind his principal within the scope of his authority. I shall not stop to distinguish between a general agent with power to act for and represent his principal in all his business transactions, and a special agent empowered to do a particular act or a series of acts in regard to a particular subject; nor between those agencies created by written instruments or express words, or those which arise by implication, from recognition, acquiescence or otherwise, because the power of a bank officer generally seems to be sufficiently well known, and the distinctions to which I refer are not material to the present inquiry. It is well, however, to notice that the term agency implies the power to do just what the principal has authorized, and no more, and this though a brief is quite a sensible definition. The difficulty mostly is to know what acts the principal has authorized, and what power is fairly within the terms of the commission, for when that is ascertained there is no longer any trouble in applying the rule. If the power to act is conferred by writing, then the instrument will define what the power is and the extent of it, and if by parol instructions to do a particular act or a series of acts relating to a particular business or subject, then the authority must be ascertained from the express instructions given, and such implied authority as may be necessary to give them effect. But if the agency arises—as it must in many cases—where there is no written authority and no express parol instructions, from the relation which the agent maintains towards his principal and the nature of the employment, it is obvious that the extent of the power to bind the principal must depend upon other elements than those to which I have referred. The character of the relation, the nature of the employment, the custom and usage of the business, the recognition and acquiescence, must each of them enter largely into the consideration of the extent of the agent's authority. These remarks are peculiarly applicable to the class of agencies represented by the officers of

corporate companies. They are artificial creations and cannot think, act or speak for themselves. In all their communion and intercourse with the world, their officers must think, act and speak for them. The authority given to their officers is not contained in written instruments nor in express verbal instructions, but much of it must be implied from the nature of their business, its necessities, its customs and usages. It is well and wisely said in the *Mechanics' Bank* agt. *The New York and New Haven Railroad Co.* (3 *Kernan*, 599), that "whoever deals with a security of any kind, appearing on its face to-be given by one man for another, is bound to inquire whether it has been given by due authority, and if he omits that inquiry he deals at his peril." The power to make the note or other security, or to execute the deed, release or other instrument, by one man for another, exists in some form where it can be submitted to the observation and inspection of the person dealing with the agent, and if he accepts the security or the instrument without examining the commission, he confides exclusively in the representations of the agent and must take upon himself the hazard. But in those innumerable agencies of which clerks, tellers, cashiers and other officers of corporations are examples, where the power and authority rests in usage, custom and necessity, and arises by implication, it is obvious the dealer cannot satisfy himself by examination and inquiry, because there is no written authority and no principal capable of speaking, and the inquiry can only be made and the answer obtained from the representative himself. In determining the nature and extent of the authority which this class of agents may rightfully exercise, there are some things of which the courts may take judicial notice. They must recognize, I think, the general course of the banking business as it is now conducted, and the universal practice of those employed to conduct it. They may know that the circulating notes are signed by the presidents and cashiers; that the

deposits are received and paid out by the clerks, tellers and cashiers, and the certificates of deposits and the certificates upon the face of checks drawn by the dealers and depositors are signed by the same class of officers or by one of them.  These duties make up a large part of the business daily transacted at every bank.  The authority of this class of agents to do these acts within the walls of the banking institutions, and at their counters, is never the subject of enquiry or examination.  It is never doubted or questioned, but is presumed from the nature of the employment and the necessities of the business.

The checks in controversy are dated on the 16th day of February, 1852, drawn and signed by T. A. C. Green, payable to the order of S. W. Spencer, cashier, directed to the Butchers' and Drovers' Bank, and certified as good for $1,000, and signed under the certificate, R. Peck, teller. Both before and after the date of the checks, Green was a dealer and depositor of the bank, and had an account upon its books.  In July, 1851, the plaintiff received a similar check from Green, certified in the same manner, for $3,400, and in December of the same year a similar check certified in like manner for $1,500, both of which were paid by the defendant to the plaintiff before the checks in controversy were received.  Subsequently to the 16th February, 1852, and before the checks in question were presented for payment, Green deposited with the defendant, at various times and in various sums, $6,000, which he drew out upon his certified checks.  The proof showed that Peck had express authority to certify the checks of dealers, and he was furnished with a book in which he entered the checks so certified.  Robert Buck, a witness in the employment of the defendant ten or fifteen years, testified : That "the paying teller was in the habit of certifying checks.  They would be presented to pay debts and take up notes.  They were substituted for bank bills.  The teller would sometimes write good upon them, and sometimes merely his name.  It

Farmers' & Mechanics' Bank of Kent Co. agt. Butchers' & Drovers' Bank.

was then charged in the certification book, and was considered as charged against the account of· the person in whose favor it was certified. It is customary in some instances for the paying teller to certify checks of customers when they have no funds, if they have confidence in them." Jacob Ames, the president of the bank, testified: "We don't give our teller liberty to certify checks when the drawers have not sufficient funds in the bank, without special permission. I have told Peck to be careful not to certify checks unless the drawers had funds in the bank to cover them." This limitation upon the teller's authority not to certify unless the drawers have funds in the bank, or the bank has confidence in the drawers, according to the evidence of Buck, or not to certify in the absence of funds without special permission, is not very absolute or stringent. But give it all reasonable effect, and we cannot evade the force of these considerations. If the limitation is to be operative at all, it must operate to defeat every certificate made in the absence of funds. So that an error in making up the drawer's accounts or the omission of some subordinate clerk to charge a voucher previously received, would prove fatal to the validity of a certificate in the hands of an innocent holder for value. The limitation not to certify in the absence of funds, is not contained in any written instrument or resolution which may be seen and examined, but is a mere parol direction dependent upon the existence of a fact—the possession of funds—which cannot be known to those who accept the security upon the faith of the certificates.

The rule that he who deals with the agent of another is bound to look into the agent's commission for the measure of his authority, must have a qualified application to an agent with a general power coupled with a limitation not patent or open to common observation. Such a limitation, if it could operate, would be destructive of the power. Suppose that Spencer, to whose order these checks were

payable, had desired to assure himself that Green had funds in thé bank to cover them, of whom would he have made inquiry? Of the bank officers certainly, and they or one of them had already said that the checks were good for the sums expressed in them, and what could be said more? It is evident, therefore, that the limitation is inconsistent with the power, or at least deprives it of all practical value, because, as the checks would lose all credit and currency if their validity depended upon the existence of the funds required by the condition, the authority to certify would have no real value. Let us look at the subject in another aspect. The act of paying a dealer's check is an act of quite as much moment to the bank and may be subject to the same limitation as certifying the same check. Indeed we may safely assume that the teller of every bank has directions not to pay unless the drawer has funds. Now the officer by inadvertence or in the confidence that the drawer's account will be made good pays to a holder for value. He has clearly transgressed his directions. Can the bank repudiate the act of the officer and recover the money back upon the ground of want of power? The case of *Hull* agt. *The Bank of the State* (*Dudley's So. Car. Rep.* 259) is an authority against the recovery. The officer had general power to pay the checks of its dealers at its counter in the usual course of business, which he was in the daily habit of exercising, and that was enough to protect a holder for value to whom the check had been paid, notwithstanding the want of funds. Any other rule would destroy confidence and put the interests of those who deal with such institutions in constant peril.

There are several authorities much relied upon by the counsel for the defendant which I think right to notice. *Grant* agt. *Norway* (10 *Com. Bench,* 665) was a case where the master of a vessel in the East Indies had signed a bill of lading in the usual form, declaring that certain goods had been shipped on board his vessel, to be delivered in

London to the order of Biale Kock & Co., their order or assigns, who afterwards indorsed it, for value received, to the plaintiffs. The goods in fact were never shipped, and the action was brought by the plaintiffs against the owners of the vessel for the injury they had sustained in giving credit to the bill. Bills of lading are regarded, in some sense, as negotiable instruments, and the right to the property mentioned in them passes by indorsement. In signing bills of lading the master acts for and has power to bind the owners. The sole question was, the liability of the owners upon the signature of the master. The court of common pleas held they were not liable. JERVIS, Ch. J., in delivering the judgment, says : " Is it usual, in the management of a ship carrying goods on freight, for the master to give a bill of lading for goods not put on board ? For all parties concerned have a right to assume that an agent has authority to do all which is usual. The very nature of a bill of lading shows that it ought not to be signed until the goods are on board, for it begins by describing them as shipped." He concludes by observing that " the general usage gives notice to all people that the authority of the captain to give bills of lading is limited to such goods as have been put on board, and the party taking a bill of lading, either originally or by indorsement, for goods which have never been put on board, is bound to show some authority given to the master to sign it." *Coleman* agt. *Riches* (29 *Eng. Law & Eq. R.* 323) arose upon a receipt given for grain which had never been delivered, and is similar in principle. (*Vide also Hubbersly* agt. *Ward*, 8*th Exchequer*, 330). In the case of the *Schooner Freeman* agt. *Buckingham and others* (18 *How. U. S. R.* 182), the supreme court of the United States held the same opinion, and the reasons were assigned by Mr. Justice CURTIS, who says : The master " has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped, and he has also authority to sign a bill of sale of

the ship when in case of disaster the power of sale arises. But the authority in each case arises out of and depends upon a particular state of facts. It is not an unlimited authority in the one case or in the other, and his act in either case does not bind the owner, even in favor of an innocent purchaser, if the facts upon which the power depends did not exist. And it is incumbent upon those who are about to change their condition upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends."

I have extracted thus largely from these cases, because I desire it may be seen how little analogy there is between a bill of lading and a certified check designed to pass from hand to hand, and to some extent to supply the place of currency. The primary purpose of a bill of lading is to furnish written evidence that the goods have been actually put on board the vessel, with their quantity and marks, the name of the consignor and consignee, the places of departure and discharge, with the price of the freight, &c. And when it is said that a bill of lading passes by indorsement and delivery, it means that the indorsement and delivery of the bill transfers the property in the goods therein described (3 *Kent. Com.* 207), and not that it passes from one person to another as a chose in action for the payment of a sum certain. The master's connection with and power over the property, and to bind the owner in respect thereto, depends upon the fact of its being shipped; and persons intending to acquire title to it by indorsement and transfer of the bill, know, by the universal usage as well as by the terms of the bill, that the act of the master is of no force unless the goods have been put on board the vessel. *The North River Bank* agt. *Aymar* (3 *Hill*, 263) was also referred to on the argument. The defendants were executors of Pexcel Fowler, and were sued on certain promissory notes, some of which were signed by Jacob D. Fowler as follows : Pexcel Fowler, by Jacob D. Fowler, attorney ;

and others of them were indorsed in the same form. They were not made and indorsed in the business of the principal, but in that of David Rogers & Son; and it is worth while to notice that the written power under which Jacob D. Fowler acted was executed by Pexcel Fowler and left with the plaintiffs. The supreme court held the defendants liable, Ch. J. NELSON dissenting; and the ground of his dissent is given in the first paragraph of his opinion as follows : " The attorney's power was limited in express terms to the business of the principal, and the use of his name for the accommodation of D. Rogers & Son was without authority, and therefore void. The plaintiffs are, moreover, to be deemed cognizant of the special limitation contained in the letter of attorney, for it was deposited with them and remained in their possession to the time of discounting the notes in question; and even without this, as the notes were signed by an attorney, it was their duty to inquire into his authority." The judgment was reversed in the late court for the correction of errors, and nothing remains to show the grounds of the reversal. They could be none other, however, than those given in the dissenting opinion of Ch. J. NELSON. Now, I can perceive but little resemblance between the written authority which is open to inspection, to do an act or a series of acts in relation to the business of his principal, and the general unwritten authority of an officer of a banking incorporation representing and acting for his principal at its place of business, with the usual power to certify the checks of its dealers, coupled with private instructions not to certify in the absence of funds without special permission.

The defence in this action is not aided by the decision of this court in the *Mechanics' Bank* agt. *The N. Y. & New Haven Railroad Co.* I notice two of its leading principles : 1st. By the charter of the railroad company the capital was limited to $3,000,000, divided into 30,000 shares of $100 each. " The entire capital was represented in the

franchises of the corporation, and the owner of each share was entitled to a fixed and unalterable proportion of that capital. And it follows that any attempt to create a greater number of shares, by the issue of additional certificates, is not only a violation of the organic law of the corporation, but a direct invasion of the contract between it and each holder of its original stock." 2d. The by-laws of the company declared that all transfers of stock should be made in the transfer book kept in the proper office, and when a certificate of stock should be issued the same should be surrendered prior to the transfer being made. All certificates had this condition written upon their face. " The bank, in making their loan to Kyle, took from him an assignment and power of attorney in blank, but paid no regard to the fundamental conditions on which alone a legal title to stock could be transferred. Of these conditions of course they had notice. The certificate was void in the hands of Kyle, because issued by an agent without authority, there being no surrender of a previous certificate and no transfer to him on the books of actual stock ; and this want of authority was known to him." I see no sort of resemblance between that case and the one now under consideration.

I therefore adopt the conclusion that where the teller or other proper officer of a banking corporation, representing it and doing its business at the counter, certifies the checks of its dealers and depositors drawn upon it in the usual form, under a general power to certify, such banking incorporation is responsible to holders in good faith and for value, notwithstanding private directions not to certify in the absence of funds without special permission.

The judgment should be affirmed.